JOURNAL ENTRY and OPINION
{¶ 1} Appellant Joseph Tagliaferro appeals the trial court's denial of his request to publish his hands in close proximity to the jury. He assigns the following error for our review:
"I. The trial court erred when at the conclusion of the defendant's testimony at trial it denied the defendant's request to publish his hands to the jury in close proximity to the jury so that all the jurors could see defendant's hands."
 {¶ 2} Having reviewed the record and pertinent law, we affirm the trial court's decision. The apposite facts follow.
 {¶ 3} On December 30, 2004, the Cuyahoga County Grand Jury indicted Tagliaferro for one count of aggravated robbery with one and three-year firearm specifications, and for one count of theft. Tagliaferro pled not guilty at his arraignment. On May 19, 2004, the matter proceeded to a jury trial.
 Jury Trial {¶ 4} The State presented eight witnesses including Karyn Dubose, who testified that on September 1, 2004, while working as a teller at the U.S. Bank branch located inside a Giant Eagle supermarket in Brooklyn, Ohio, she observed a man at the counter filling out what she believed to be a deposit slip. Moments later, the man approached and presented a note, which indicated he was robbing the bank. As Dubose reached into the drawer for the money, the man stated he was armed. Dubose handed him the money, and the man left the bank.
 {¶ 5} Dubose testified that she was able to look at the robber, and immediately after the robbery, she described him to the police. In November 2004, when the police showed her a photographic array, she identified Tagliaferro as the robber.
 {¶ 6} Dubose identified Tagliaferro in court, and when provided with a voice sample, she testified that it was the same voice as the robber's. Finally, Dubose testified that although Tagliaferro had lost weight, had cut his hair, and had shaved his moustache, she was positive he was the robber.
 {¶ 7} Detective C.J. Frey of the Brooklyn Police Department testified that on November 10, 2004, he was interviewing an individual at the police station. During the interview, the individual, a manager of a Taco Bell restaurant, observed a surveillance photograph of the robbery suspect on the wall of the police station. Detective Frey learned that the robbery suspect frequented the restaurant, which the interviewee managed.
 {¶ 8} Detective Frey testified that he contacted Officer Paul Ontko of the Cleveland Police Department where the Taco Bell restaurant was located. Detective Frey showed Officer Ontko the surveillance photographs of the robbery suspect. Officer Ontko indicated that the suspect resembled an individual by the name of Joe Tagliaferro. Officer Ontko also provided a possible address of Tagliaferro.
 {¶ 9} Detective Frey retrieved Tagliaferro's Bureau of Motor Vehicles (BMV) photograph, constructed a photographic array, and contacted Dubose. Detective Frey testified that he showed Dubose the surveillance video of the robbery, and then showed her the photographic array. Dubose identified Tagliaferro as the bank robber.
 {¶ 10} Detective Frey testified that on November 16, 2004, they obtained an arrest warrant for Tagliaferro. They immediately began combing the area in the vicinity of Tagliaferro's address, and at approximately 6:00 p.m., they observed Tagliaferro, along with a female companion, drive into the rear parking lot of his apartment building. Detective Frey and fellow officers approached Tagliaferro, identified themselves, and placed him under arrest after he confirmed his identity.
 {¶ 11} Detective Frey testified that once they had Tagliaferro in custody, they showed him the surveillance photograph; he claimed the photograph was not him. Tagliaferro refused to give consent to search his apartment, and he stated that anybody could have planted evidence. On November 17, 2004, Detective Frey and fellow officers executed a search warrant at Tagliaferro's apartment. They discovered clothing and eyeglasses similar to those worn by the bank robber. In addition, they found Tagliaferro's hair clippings.
 {¶ 12} Detective Michael Klein of the Parma Police Department testified that he handled the photographic and video evidence of the robbery. Detective Klein testified that he separated the multiple camera angles from the video surveillance tape of the bank robbery, so that a person could view it like a movie.
 {¶ 13} Detective Klein also testified that in the middle of November 2004, the police department obtained another surveillance video from the bank where the robbery took place. They believed the same individual pictured in the first video was in the bank conducting business on November 14, 2004. Detective Klein separated the multiple camera angles as he did in the first video.
 {¶ 14} Detective Klein further testified that the police department obtained a third video, wherein Tagliaferro allowed himself to be videotaped inside the bank prior to the trial. Detective Klein also separated the multiple camera images as he did in the previous two videos. Finally, Detective Klein played all three videos for the jury.
 {¶ 15} Tagliaferro's girlfriend, Michelle Metcalf, testified that Tagliaferro was having financial difficulties during the month of September 2004. He had been fired from his job, was late in his rent, and had child support obligations for four children. Metcalf testified that she and Tagliaferro had been to the U.S. Bank branch inside the Giant Eagle before, and also went there on November 14, 2004. On cross-examination, Metcalf admitted that when she first saw the surveillance video of the bank robbery she stated "aw shit, it's Joe."
 {¶ 16} Detective Kenneth Fittro testified that he was in charge of the bank robbery investigation. Detective Fittro testified that when he arrested Tagliaferro, he stated that he was at work the day of the robbery. Detective Fittro stated that their investigation revealed that Tagliaferro was fired from his job, because on the day of the robbery, he signed in at work and left without working.
 {¶ 17} Tagliaferro testified that he was not having financial difficulties in September 2004. He also stated that he did not have facial hair on September 1, 2004, because he had shaved it in August, but allowed it to grow back in October, prior to his arrest. He further stated that his ring finger is deformed and he has no fingernails. Tagliaferro admitted that when he was arrested, he told the police he was at work the day of the robbery, but later told them he had spent the day with his girlfriend.
 {¶ 18} Based on the above evidence, the jury found Tagliaferro not guilty of aggravated robbery, but guilty of theft. The trial court sentenced Tagliaferro to a prison term of one year.
 Admission or Exclusion of Evidence {¶ 19} In his sole assigned error, Tagliaferro argues the trial court erred when it denied his request to display his hands to the jurors as they filed out of the courtroom. We disagree.
 {¶ 20} A review of the record indicates the following exchange took place prior to closing arguments:
"Mr. Costanzo: Yes, your Honor. I would like to proffer forthe record that, prior to the defendant getting off the standfrom his testimony, I asked the Court if the jurors could fileout of the room, and the defendant display his hands for thejury, and the court summarily denied it, stating that the jurorswere able to view it from the witness stand. And of course, feltthat the jurors in the back row, and all the way down towards thedoor of the courtroom, could not possibly have seen or viewed thehands of the defendant.
 The Court: Mr. Costanzo, maybe you weren't in the courtroomwhen, on direct examination of your client, I allowed you to haveyour client stand up and show his hands to the jury, butapparently that wasn't sufficient, so your proffer has beenmade."[1]
 {¶ 21} The above excerpt indicates that the trial court had previously allowed Tagliaferro to publish his hands to the jury. Evid.R. 611(A) provides:
"The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to 1) make the interrogation and presentation effective for the ascertainment of the truth, 2) avoid needless consumption of time, and 3) protect witnesses from harassment or undue embarrassment."
 {¶ 22} Additionally, the trial court enjoys broad discretion in admitting or excluding evidence. A reviewing court will not reject an exercise of this discretion unless it clearly has been abused and the criminal defendant thereby has suffered material prejudice.[2] An abuse of discretion is more than an error of law or judgment and implies that the court's attitude is unreasonable, arbitrary or unconscionable.[3] Furthermore, when applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court.[4]
 {¶ 23} In the instant case, the jury was presented with sufficient evidence identifying Tagliaferro as the individual who robbed the bank. The bank teller, Dubose was positive in her identification of Tagliaferro. She observed him as he stood at the counter writing the note, and had the opportunity to get a close look at his face when he handed her the note. She was able to give a description to the police, and was able to identify Tagliaferro from the photographic array. Finally, Dubose identified Tagliaferro in court, both from her memory of the robbery and from the voice sample he provided.
 {¶ 24} Additionally, the jury had the opportunity to view three separate videotapes. The first video depicted the robbery, the second video depicted Tagliaferro in the bank on November 14, 2004, and the third video depicted Tagliaferro when he allowed himself to be videotaped in the bank prior to trial. Apparently, the jury believed that it was Tagliaferro in all three videos.
 {¶ 25} Further, Tagliaferro's girlfriend, Metcalf responded "aw shit, it's Joe" when the police showed her the surveillance tape. At trial, Metcalf initially denied that she made that statement, but on cross-examination she admitted that she could have made the statement, because the pictures had a strong resemblance to Tagliaferro.[5]
 {¶ 26} Finally, Detective Fittro, the lead investigating officer, testified specifically about the nature of Tagliaferro's hand. The following exchange took place:
"Q. Okay. And what about his finger? Did you look at hisfingers that day?
 A. Yeah. The only thing I saw, I believe it was his right ringfinger had the one knuckle closest to the hand, I guess, wasslightly enlarged, like arthritic. But other than that, I didn'tnotice anything different. If I recall, he had fingernails then,and I didn't notice any other deformities or different things onhis hands."[6]
 {¶ 27} Based on our review of the record before us, we conclude that the State presented overwhelming evidence that Tagliaferro robbed the bank. Moreover, because the teller, Dubose could not see his hands during the robbery, because they were under the counter, any deformity was irrelevant. Therefore, the trial court did not abuse its discretion in denying Tagliaferro's second request to publish his hands to the jury. The trial court's decision represented the proper exercise of its authority to maintain order in the courtroom or monitor the presentation of evidence in accordance with Evid.R. 611 and was not prejudicial to Tagliaferro. Accordingly, we overrule Tagliaferro's sole assigned error.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal. It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Ann Dyke, A.J., and Sean C. Gallagher, J., concur.
[1] Tr. at 332-333.
[2] State v. Wade (May 7, 2003), 9th Dist. No. C.A. 02CA0076-M, 2003-Ohio-2351; State v. Long (1978),53 Ohio St.2d 91, 98.
[3] Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
[4] Pons v. Ohio State Med. Bd., 66 Ohio St.3d 619, 621, 1993-Ohio-122.
[5] Tr. at 255.
[6] Tr. at 279.